# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION DERIVATIVE LITIGATION | Civil Action No.: 2:17-cv-01248-WHW-CLW<br><br>**JURY TRIAL DEMANDED** |

## CONSOLIDATED VERIFIED
## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs John Lautzenheiser ("Lautzenheiser"), Michael S. Graniero, III ("Graniero") and Marjorie A. Hoy, as Trustee and Beneficiary of the James B. Hoy & Marjorie A. Hoy TTEES FBO Marjorie A. Hoy Rev Liv Trust ("Hoy") (collectively, "Plaintiffs"), by their undersigned counsel, submit this Consolidated Verified Shareholder Derivative Complaint on behalf of Cognizant Technology Solutions Corporation ("Cognizant" or the "Company") against certain current and former officers and members of Cognizant s Board of Directors (the "Board") named herein. Plaintiffs make these allegations upon personal knowledge as to their own actions and, as to all other matters, on information and belief based upon the investigation of their undersigned counsel which include, among other things: (1) a review of Cognizant s public filings with the U.S. Securities and Exchange Commission ("SEC"); (2) pleadings, papers, and any documents filed with and publicly available from a related pending securities fraud class action captioned *In re Cognizant Technology Solutions Corporation Securities Litigation*, No. 2:16-cv-06509 (D. N.J.) (the "Securities Class Action"); and (3) a review of news reports, press releases, and other publicly available sources.

## I.     NATURE OF PROCEEDINGS

1.      This shareholder derivative action is about Cognizant s, multi-year, multi-million dollar bribery scheme perpetrated in India in violation of the U.S. Foreign Corrupt Practices Act

the ("FCPA") and other applicable anti-corruption and anti-bribery laws, and insider trading by top Company insiders before the long-running bribery scheme was revealed.  Plaintiffs, on behalf of nominal defendant Cognizant, assert claims against the Individual Defendants (defined below) for breaches of fiduciary duties, unjust enrichment, insider selling, violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), issuing false and misleading statements in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and corporate waste, which occurred from at least February 25, 2015 to September 29, 2016 (the "Relevant Period").

2.      Although headquartered in the U.S., Cognizant s principal operations are based in India.  This was vital to profitability: under the direction of the Individual Defendants, the Company leveraged the lower labor, tax, and other business costs of its Indian operations to provide IT services to its global clients at highly competitive prices.

3.      One of the principal ways Cognizant cut its own costs, and in turn delivered low cost services to clients, was by locating its Indian "campuses" in "Special Economic Zones" or "SEZs."  Companies operating from within SEZs are guaranteed a number of highly lucrative benefits, including numerous tax exemptions and holidays; easing of various customs and labor regulations and procedures; and heightened access to credit, infrastructure, and other resources.

4.      To develop or operate a facility within a SEZ, businesses are required to secure licenses from India s government.  Given the extraordinary value that flows to license holders, SEZ licenses are highly sought-after.

5.      At the beginning of the Relevant Period, the Individual Defendants faced pressure to obtain these valuable licenses for the Company because the Indian central government indicated it would soon begin to eliminate the availability of tax benefits for new operations in

the SEZs.  This led to Cognizant aggressively expanding its SEZ operations under the direction of the Individual Defendants, including constructing or expanding four of its ten massive "global delivery centers," each housing thousands of employees.

6.     The Individual Defendants publicly proclaimed in the Company s SEC filings that Cognizant was profiting enormously from the SEZ status of its Indian operations.  For example, when Cognizant s Annual Report on Form 10-K was filed with the SEC on February 25, 2016, the Individual Defendants stated therein that tax benefits derived from SEZ licenses increased the Company s net income by $201.4 million (more than 14%) and increased diluted earnings per share ("EPS") by $0.33 per share (more than 12%).

7.     Significantly, while the Individual Defendants were reporting strong financial results based in substantial part on the location of Cognizant s Indian operations in SEZs, they repeatedly assured investors that the Company was in compliance with anticorruption laws and was not paying bribes to foreign officials to obtain its SEZ licenses.  At all times, the Company s compliance with anticorruption and anti-bribery laws was important to shareholders and analysts alike given the benefits the SEZs provided to the Company and the risks this illegal behavior would pose to Cognizant s ability to obtain and retain its SEZ licenses.

8.     During the Relevant Period, the Individual Defendants caused Cognizant to issue annual "Sustainability Reports," assuring investors that audits of anticorruption compliance had been conducted, which had uncovered "no incidents" of corruption.  Similarly, the Individual Defendants caused the Company to routinely assure investors in SEC filings throughout the Relevant Period that the Company s internal controls implemented to detect any kind of improper payments were "effective."

9.     The Individual Defendants representations were patently false.  On September 30, 2016, the truth began to be revealed by the unexpected, abrupt departure of Cognizant s then-President, defendant Gordon J. Coburn ("Coburn").  The Individual Defendants did not explain or offer any reasons for Coburn s sudden departure, although he had been regarded by at least one senior Cognizant employee as the "second in command" and "public face" of the Company.[1]

10.     That same day, in a Form 8-K filed with the SEC, it was also revealed the existence of "an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act [("FCPA")] and other applicable laws."  The 8-K stated that this purportedly independent internal investigation was being conducted under the oversight of the Company s Audit Committee, with the assistance of outside counsel, and that the investigation was "currently focused on a small number of Company-owned facilities."

11.     On September 30, 2016, the Company announced that the U.S. Department of Justice ("DOJ") and the SEC had been notified regarding the internal investigation and that the Company was "cooperating fully with both agencies."

12.     The internal investigation ultimately revealed that between 2010 and 2015, the Company made *at least $6 million* in improper payments to Indian officials to obtain SMZ licenses for its Indian facilities.  Importantly, it was also revealed in Cognizant s Quarterly Report on Form 10-Q, filed November 7, 2016, that "certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company

---

[1]     In denying in part the motion to dismiss in the Securities Action in August 2018, this Court concluded that "the inference that Coburn was a participant in the bribery is  cogent and at least as compelling  as the nonculpable inference that he resigned because of poor performance or unfortunately serendipitous timing."

relating to real estate and procurement principally in connection with permits for certain facilities in India."

13.     Egregiously, while the Company s stock was trading at inflated prices due to the Individual Defendants  false and misleading statements alleged herein claiming that the Company was in compliance with anticorruption laws and was not paying bribes to foreign officials to obtain its SEZ licenses, certain of the Individual Defendants   including Board members -- benefited from their knowledge of material, adverse, non-public information and the artificially inflated price of the Company s stock, by collectively selling their personally held Cognizant shares for **over $48 million** in proceeds before the truth was revealed.

14.     The Individual Defendants breached their non-exculpable fiduciary duties of loyalty and good faith and committed other violations of law, and as a result of their misconduct, Cognizant has suffered damages as alleged herein.

15.     As a result of the Individual Defendants  serious misconduct alleged herein, in 2016 the Company was named as a defendant in the Securities Class Action.  Very recently, on August 8, 2018, this Court denied in part the motion to dismiss filed in the Securities Class Action.  In so doing, this Court concluded, among other things, that three sets of false and misleading statements had been sufficiently alleged: (a) statements touting the benefits of SEZ licenses; (b) statements in the 2015 & 2016 Sustainability Reports touting anticorruption compliance and training and claiming no significant risks of corruption were reported; and (c) financial reports which misstated bribes as capital expenditures.  Moreover, this Court concluded based on the facts alleged there is a strong inference of scienter as to Cognizant based on the "breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the

[C]ompany, and the alleged involvement of Defendant Coburn and other unnamed members of senior management."

16.     This derivative action is brought by Plaintiffs to ensure that the Individual Defendants be held accountable for the severe harm flowing to the Company from their breaches of fiduciary duty and other serious misconduct.

## II.     JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.   This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

18.     The Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District, so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants  primary participation in the wrongful acts detailed herein, occurred in this district.   The Company is headquartered in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## III.     PARTIES

### A.     Plaintiffs

20.    Plaintiff Lautzenheiser was a shareholder of Cognizant at the time of the wrongdoing complained of, has continuously been a shareholder of Cognizant since May 8, 2012and is a current Cognizant shareholder.

21.    Plaintiff Graniero was a shareholder of Cognizant at the time of the wrongdoing complained of, has continuously been a shareholder of Cognizant since December 2014 and is a current Cognizant shareholder.

22.    Plaintiff Hoy was a shareholder of Cognizant at the time of the wrongdoing complained of, has continuously been a shareholder of Cognizant since March 28, 2013, and is a current Cognizant shareholder.

**B.    Nominal Defendant**

23.    Nominal Defendant Cognizant is incorporated in Delaware and its principal place of business is located at 500 Frank W. Burr Boulevard, Teaneck, New Jersey 07666.

**C.    Individual Defendants**

24.    Defendant Francisco D Souza ("D Souza") has been a director of the Company and the Chief Executive Officer ("CEO") since 2007.    During the Relevant Period, D Souza served on the Executive Committee with defendants Coburn and Lakshmi Narayanan ("Narayanan").    D Souza received $11,951,383 in compensation from Cognizant for the year ended December 31, 2015, and $12,030,863 in compensation from Cognizant for the year ended December 31, 2016.

25.    Defendant Karen McLoughlin ("McLoughlin") has been the Company s Chief Financial Officer ("CFO") since February 6, 2012.    She received $3,705,728 in compensation from Cognizant for the year ended December 31, 2015, and $3,637,530 in compensation from Cognizant for the year ended December 31, 2016.

26.      Defendant Coburn was the Company s President until September 27, 2016, when he abruptly resigned.  Coburn had been President of Cognizant since February 6, 2012.  Prior to that, from March 1998 until February 2012, Coburn was the Company s CFO and Treasurer, and from January 2007 until February 2012, he also held the position of Chief Operating Officer. Prior to his departure from the Company, Coburn also served on the Board s Executive Committee with defendants D Souza and Narayanan.  Coburn is a defendant in the sustained Securities Class Action.  Coburn received $6,968,995 in compensation from Cognizant for the year ended December 31, 2015, and $4,494,983 in compensation from Cognizant for the year ended December 31, 2016.

27.      Defendant Thomas M. Wendel ("Wendel") served as a director of the Company from June 2001 until June 6, 2017.  During the Relevant Period, Wendel was Chairman of the Nominating and Corporate Governance Committee and a member of the Audit Committee.  He received $293,996 in compensation from Cognizant for the year ended December 31, 2015, and $325,447 in compensation from Cognizant for the year ended December 31, 2016.

28.      Defendant John E. Klein ("Klein") has been a director of the Company since March 1998 and has served as the Chairman of the Board since December 2003.  During the Relevant Period, Klein was Chairman of the Compensation Committee and a member of the Audit and Nominating and Corporate Governance Committees.  Klein received $440,441 in compensation from Cognizant for the year ended December 31, 2015, and $494,947 in compensation from Cognizant for the year ended December 31, 2016.

29.      Defendant Zein Abdalla ("Abdalla") has been a director of the Company since September 2015.   During the Relevant Period, Abdalla was a member of the Audit and Nominating and Corporate Governance Committees.    Abdalla received $180,423 in

compensation from Cognizant for the year ended December 31, 2015 and $323,947 in compensation from Cognizant for the year ended December 31, 2016.

30.     Defendant Jonathan C. Chadwick ("Chadwick") has been a director of the Company since April 2016.  During the Relevant Period, Chadwick was a member of the Audit Committee. Chadwick received $359,302 in compensation from Cognizant for the year ended December 31, 2016.

31.     Defendant Leo S. Mackay, Jr. ("Mackay") has been a director of the Company since September 2012.  During the Relevant Period, Mackay was a member of the Audit Committee. He received $289,496 in compensation from Cognizant for the year ended December 31, 2015, and $316,447 in compensation from Cognizant for the year ended December 31, 2016.

32.     Defendant Maureen Breakiron-Evans ("Breakiron-Evans") has been a director of the Company since May 2009.  During the Relevant Period, Breakiron-Evans was Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee. She received $314,804 in compensation from Cognizant for the year ended December 31, 2015, and $350,447 in compensation from Cognizant for the year ended December 31, 2016.

33.     Defendant Robert E. Weissman ("Weissman") served as a director of the Company from May 2001 until December 14, 2017.  During the Relevant Period, Weissman was Chairman of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.  He received $298,804 in compensation from Cognizant for the year ended December 31, 2015, and $328,447 in compensation from Cognizant for the year ended December 31, 2016.

34.     Defendant John N. Fox, Jr. ("Fox") has been a director of the Company since December 2007.  During the Relevant Period, Fox was a member of the Compensation and

Nominating and Corporate Governance Committees. He received $287,996 in compensation from Cognizant for the year ended December 31, 2015, and $313,447 in compensation from Cognizant for the year ended December 31, 2016.

35. Defendant Narayanan served as a director of the Company from December 2003 until June 6, 2017. Narayanan s career at Cognizant started in 1994 when he served as Chief Technology Officer at the Company s Indian subsidiary and was promoted to President of that unit in 1996. Thereafter, in 1998, Narayanan was named President of Cognizant, being elevated to the role of CEO and President in 2003, positions he held until 2006. He became the Company s Executive Vice Chairman in 2007, a position he held until November 2014. During the Relevant Period, Narayanan was the Vice Chairman of the Board and served on the Executive Committee with defendants D Souza and Coburn. Narayanan received $278,996 in compensation from Cognizant for the year ended December 31, 2015, and $299,947 in compensation from Cognizant for the year ended December 31, 2016.

36. Defendant Michael Patsalos-Fox ("Patsalos-Fox") has been a director of the Company since July 2012. During the Relevant Period, Patsalos-Fox was a member of the Compensation and Nominating and Corporate Governance Committees. He received $287,996 in compensation from Cognizant for the year ended December 31, 2015, and      $313,447     in compensation from Cognizant for the year ended December 31, 2016.

37. Defendant Rajeev Mehta ("Mehta") is the President of Cognizant. Mehta has worked at Cognizant since 1997, and prior to his role as President, he served as Chief Executive of IT services. In that position, he led industry, geographic, and delivery operations globally.

38. Defendant Ramakrishnan Chandrasekaran ("Chandrasekaran") is the Company s Executive Vice Chairman for Cognizant s India operations.

39.     Defendants Coburn, D Souza, McLoughlin, Wendel, Klein, Abdalla, Chadwick, Weissman, Mackay, Breakiron-Evans, Mackay, Fox, Patsalos-Fox, Mehta, Chandrasekaran, and Narayanan are collectively referred to herein as the "Individual Defendants."

40.     Defendants Abdalla, D Souza, Mackay, Weissman, Breakiron-Evans, Fox, Narayanan, Wendel, Chadwick, Klein, and Patsalos-Fox are collectively referred to herein as the "Director Defendants."

41.     Defendants D Souza, Coburn, Breakiron-Evans, Fox, Klein, and McLoughlin are collectively referred to herein as the "Insider Selling Defendants."

42.     Defendants Abdalla, Mackay, Breakiron-Evans, Wendel, Chadwick, and Klein are sometimes collectively referred to herein as the "Audit Committee Defendants."

## IV.   THE INDIVIDUAL DEFENDANTS' DUTIES

43.     By reason of their positions as officers, directors, and/or fiduciaries of Cognizant and because of their ability to control the business and corporate affairs of Cognizant, the Individual Defendants owed Cognizant and its shareholders fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage Cognizant in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Cognizant and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Cognizant and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cognizant, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Cognizant, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

45.    To fulfill their duties, the officers and directors of Cognizant were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Cognizant were required to, among other things:

    a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to provide the highest quality performance of their business;

    b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.    When put on notice of problems with the Company s business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

46.    Pursuant to the Audit Committee Charter, all members of the Audit Committee were and are responsible for, among other things, overseeing: "[1] [t]he integrity of the Company s financial information reported to the public and the adequacy of the Company s internal controls; [2] [t]he qualifications, independence and performance of the Company s independent registered public accounting firm (the "independent auditors"); [3] [t]he performance of the Company s internal audit function; and [4] [t]he review and evaluation of enterprise risk management."  Further, according to the Audit Committee Charter:

The Audit Committee shall review and discuss with the Company s management and independent auditor the Company s audited financial statements . . . .

The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company s audited financial statements be included in the Company s Annual Report on Form 10-K.

*      *      *

The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor s review of interim financial information.

*      *      *

The Audit Committee shall:

(i)     Review with management and independent auditors the earnings press releases; and

(ii)    Periodically discuss with management, policies regarding earnings release, financial information and earnings guidance provided to analysts.

47.     The Company also maintains an Anti-Corruption Policy which applies to all Cognizant employees, including directors and officers, as well as all Cognizant business units and subsidiaries, joint ventures over which Cognizant has operational control, and business partners (collectively, "Associates").  Per the Anti-Corruption Policy, Cognizant commits to "doing business ethically and complying with all anti-corruption laws that may apply to the Company including the FCPA, the U.K. Bribery Act 2010 (the "UK Bribery Act"), and local anti-corruption laws."

48.     The Anti-Corruption Policy states, "[n]o one   neither Cognizant employees nor others acting on Cognizant s behalf   is permitted to offer, make, promise, request, or accept a bribe, or to otherwise make any improper payment in connection with Cognizant s business."  To this end, Cognizant s Anti-Corruption Policy states, in relevant part:

Cognizant s rule about corruption is simple:  we never pay bribes or act corruptly.

*       *       *

This [Anti-Corruption] Policy prohibits bribery of Government Officials and private persons, or making payments to relatives, friends, or colleagues of a private person or of a Government Official to obtain an unfair business advantage.

49.     Moreover, Cognizant also has a Core Values and Code of Ethics ("Code of Ethics"), which applies to all of the Individual Defendants as directors and officers.  According to Cognizant s Code of Ethics, the Company s officers, directors and employees are charged with:

> **PREVENTING CORRUPT ACTIVITIES**.  **No bribery.**  Bribing a government official is illegal no matter where it occurs.  Specifically, we do not corruptly give or offer, directly or indirectly, anything of value, including cash, gifts, favors, charitable and political contributions, or hospitality/entertainment, to a government official to obtain or maintain business or any other advantage for the Company.   The same is true for private individuals doing business with Cognizant.

*       *       *

> **NEVER ENGAGE IN INSIDER DEALING**.  Through our work at Cognizant, some of us may learn about material, nonpublic (or "inside") information, potentially relating to our Company as well as other companies with which we work.  Trading securities, whether Cognizant s or a company with which we do business, based on inside information is illegal and is strictly prohibited.  Also, we may not give any such inside information   or "tip"   to others who might make trades based on it.

50.     Finally, the Company has an Insider Trading Policy (the "Insider Trading Policy"). The Insider Trading Policy is designed to prevent insider trading or the appearance of impropriety, to satisfy the Company s obligation to reasonably supervise the activities of Company personnel, and to help Company personnel avoid the severe consequences associated with violations of insider trading laws.  It applies to the Company s directors, officers, and employees and continues to apply following the termination of any such individual s service to or

14

employment with the Company until any material, nonpublic information possessed by such individual has become public or is no longer material.

51.     According to the Insider Trading Policy, "It is illegal for any director, officer or employee of the Company to trade in the securities of the Company while in the possession of material, nonpublic information about the Company.  It is also illegal for any director, officer, or employee of the Company to disclose material, nonpublic information about the Company to others who may trade on the basis of that information."

## V.    SUBSTANTIVE ALLEGATIONS

### A. Cognizant's Success as an Outsourcing Business Was Driven by Its Use of SEZs to Lower the Company's Taxes and Costs

52.     Cognizant is a leading provider of IT outsourcing services, with its principal operations in India.  Cognizant began as an Indian company headquartered in Chennai and even though the Company later moved its headquarters to the United States, the bulk of Cognizant s operations remain in India.  During the Relevant Period, more than 150,000 of Cognizant s approximately 200,000 employees, 75% of the Company s workforce, were located in India.

53.     Cognizant s success was mainly driven by its "global delivery model," in which the Company leveraged the lower labor, tax, and other costs of doing business in India to provide highly competitive pricing on its services.  The Individual Defendants repeatedly told investors that the Company s business strategy, spearheaded by Cognizant s ability to provide lower cost services, revolved around a "dual mandate" which was helping clients achieve operational efficiency by reducing their IT costs and redeploying those savings into new digital technologies. For instance, defendant McLoughlin told investors at an August 12, 2015 investor conference, "[W]e re seeing clients continue to look for partners who can execute on this dual mandate.  So help me drive down my costs of my current operations . . . and take those dollars and really

15

deploy them into meaningful digital transformation. . . . [We] think that will continue to be a driver of growth as we move forward."

54.     The Individual Defendants repeatedly touted Cognizant s success in delivering cost savings to its clients as key to its execution of this dual mandate.  For example, at a September 6, 2016 investor conference, defendant D Souza stated, "[W]e ve been very successful at, while maintaining our margins, being able to achieve the cost of ownership that the clients want."  The SEZs were the crown jewel in Cognizant s business model.  Indeed, Cognizant s website stated that India was "a crucial piece of [that] global business strategy" because of the cost savings produced by centralizing operations in India.

55.     Licenses to develop and/or operate within SEZs are awarded by Indian central and regional governments.  Companies who receive these licenses are guaranteed a plethora of lucrative benefits, including numerous tax exemptions and holidays, easing of various customs and labor regulations and procedures, and heightened access to credit, infrastructure, and other resources.  Additionally, businesses operating within SEZs are entitled to "self-certify" compliance with applicable regulatory regimes, including labor and customs laws and regulations, and have access to expedited dispute resolution mechanisms.

56.     Cognizant built and operated in India at least ten "global delivery centers" (large IT campuses that housed thousands of employees) and aggressively pursued SEZ licensing for those facilities.  In particular, Cognizant constructed or expanded at least four of its ten SEZ-licensed Indian global delivery centers during the Relevant Period:  those located in Kolkata, Coimbatore, Hyderabad, and the Company s Indian headquarters in Chennai.

57.     Building and expanding SEZ-licensed facilities was vital to the Company s performance in multiple ways.  First, building and expanding SEZ facilities increased

Cognizant s ability to increase its revenue because the more employees the Company could put to work at its SEZ facilities, the more revenue it would book.  Accordingly, analysts repeatedly focused on the Company s headcount and "utilization rates," *i.e.*, the extent to which employees time was being billed to client projects.  For instance, in a July 25, 2016 report, Deutsche Bank analysts stated, "the company continues to focus on retention efforts and we believe headcount remains an important leading indicator and expect headcount growth to accelerate ahead of revenue acceleration."

58.    Second, as noted above, the SEZ status of Cognizant s Indian operations allowed the Company to significantly reduce its tax and operating costs, which in turn was critical to its financial performance.  Indeed, in reports filed with the SEC throughout the Relevant Period, Cognizant reported that the tax benefits the Company derived from its SEZ licenses alone increased the Company s net income by hundreds of millions of dollars.  Cognizant acknowledged that these benefits materially impacted the Company s financial condition, and that "[c]hanges in Indian tax laws" that "would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition."[2]

59.    Third, the enormous tax and operating cost savings Cognizant generated through the SEZ status of its Indian operations gave Cognizant a significant competitive advantage among its outsourcing peers and was instrumental in helping the Company garner new business through the delivery of lower cost IT services to its US and European clients.  Indeed, during the Company s August 5, 2016 earnings call, defendant Coburn told investors that cost-cutting "remains absolutely essential to almost every client" the Company has, and Cognizant s SEC

---

[2]    *See, e.g.*, Cognizant s Annual Report, on Form 10-K, filed with the SEC on February 25, 2016, at 27 ("2015 Form 10-K").

filings listed "competitive pricing of services" as one of the "principal competitive factors affecting the markets for our services."[3]

### B. Planned Tax Law Changes in India Put Increased Pressure on Cognizant to Obtain SEZ Licensing for Its Facilities As Quickly As Possible

60.     During the Relevant Period, looming changes to Indian tax law that would phase out tax benefits for SEZs established after April 2017 put increased pressure on Cognizant to obtain valuable SEZ licensing for its Indian operations as quickly as possible.  In February 2015, India s Finance Minister, Arun Jaitley, sent signals that the government could in the future move to limit tax benefits for newly constructed SEZs.  The effect of this proposed change in the treatment of SEZs would have been devastating to Cognizant s business model.

61.     This put increased pressure on Cognizant to obtain valuable SEZ licensing for its Indian operations as quickly as possible.

62.     Given the enormous pressure the Company faced to obtain SEZ licensing for its facilities prior to the phasing out of tax benefits for new operations, Cognizant embarked on an SEZ development spree.  In early September 2015, Cognizant signed agreements with the Tamil Nadu state government to expand its major global delivery center in Coimbatore and its Indian headquarters in Chennai.

63.     Shortly thereafter, in March 2016, Cognizant received approval from the Telangana state government to construct a massive SEZ facility in the state s capital, Hyderabad, which would house 8,500 employees.

64.     In August 2016, Cognizant received approval to construct an SEZ facility in Kolkata, West Bengal, occupying a sprawling fifteen acre plot.

---

[3]     *See, e.g.*, Cognizant s Annual Report, on Form 10-K, filed with the SEC on February 27, 2015, at 11 ("2014 Form 10-K").

65.     Interestingly, while Cognizant was having great success procuring SEZ licensing for its Kolkata facilities, the state government refused to grant licenses to the Company s competitors, including Wipro Limited ("Wipro") and Infosys Limited ("Infosys").  Both Wipro and Infosys had purchased fifty acres of land apiece in the region based on the previous state administration s assurances that their projects would receive SEZ status, only to have the new state government decline their applications.

### C. The Individual Defendants Highlighted the Benefits of Cognizant's SEZ Licenses as a Basis of the Company's Strong Financial Performance and Assured Investors that Cognizant Did Not Violate Anti-Corruption Laws

66.     During the Relevant Period, the Individual Defendants repeatedly emphasized that the Company s SEZ facilities were the foundation of its strong financial performance.  At the same time, the Individual Defendants also assured investors that they had legitimately obtained the SEZ licenses, publicly stating that Cognizant did not make any improper payments to government officials, and that the Company maintained a system of adequate internal controls precisely to prevent such wrongdoing.

### 1. The Individual Defendants Reported that Cognizant's SEZ Operations Were a Crucial Driver of Its Strong Financial Performance

67.     When reporting Cognizant s financial results, the Individual Defendants repeatedly highlighted the benefits the Company received from the SEZ status of its Indian operations.  For instance, in the 2014 Form 10-K, Cognizant explained that its financial results were driven in significant part by its SEZ facilities, stating that "the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately [$183 million] . . . and increase diluted EPS by $0.30."  In its 2015 Form 10-K, Cognizant again emphasized that its results were driven significantly by its

Indian SEZ operations, reporting that these facilities had "increase[d] net income by approximately $201.4 million . . . and increase[d] diluted EPS by $0.33," a material increase over the prior year.

68.     The Individual Defendants went out of their way to represent to investors that expanding Cognizant s SEZ facilities was a key part of its business strategy.  For instance, in the Company s SEC filings, the Individual Defendants repeatedly stated that "[w]e pursue an international strategy that includes expanded infrastructure investments in India. . . .  We have constructed and expect to continue to operate most of our newer development facilities in SEZs," and Cognizant would continue to "[l]ocate most of our new development center facilities in tax incentivized areas."  *See* 2015 Form 10-K, at 47, 58, 92.

69.     The Individual Defendants also assured investors that Cognizant was pursuing this strategy by making significant capital expenditures to grow and expand its SEZ operations.  For instance, in its second quarter 2016 Form 10-Q, Cognizant stated that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."  *See* Cognizant Quarterly Report, on Form 10-Q, filed with the SEC on August 5, 2016, at 19.

**2.      The Individual Defendants Caused Cognizant to Falsely State that it was Not Making Improper Payments to Foreign Officials and Maintained a System of Adequate Internal Controls to Prevent Such Improper Payments**

70.     At the same time that the Individual Defendants were discussing the Company s strong financial results due to Cognizant s SEZ strategy, they made sure to tell investors that Cognizant was not bribing foreign officials, and that the Company was taking measures to ensure compliance with anti-corruption laws.

71.     The Individual Defendants knew that Cognizant was required to adhere to the requirements of the FCPA, which prohibits payments to foreign government officials for the purpose of obtaining business.  Moreover, FCPA violations include not only direct payments by the company in question, but also payments to foreign officials through third parties or shell companies.

72.     Because Cognizant s operations are principally located outside of the United States, the Company s compliance with anticorruption laws and its maintenance of adequate internal controls to ensure continued compliance were critical to investors and therefore should have been monitored carefully by the Individual Defendants.  This was particularly true of Cognizant s Indian business, not only because it comprised the vast majority of the Company s operations and was crucial to Cognizant s success, but because India has an unfortunate history as a place where corruption of the kind sought to be deterred by the FCPA occurs.  For example, a *Forbes* article published on February 11, 2016 stated that corruption watchdogs ranked India as one of the world s most corrupt countries during the Relevant Period.[4]

73.     U.S. companies  Indian operations were an increasingly prominent target of FCPA enforcement programs.  In fact, over the past decade, "both the DOJ and the SEC have targeted misconduct in India across a wide range of industries from manufacturing and construction to oil and information technology."[5]

74.     None of this was lost on the Individual Defendants as Cognizant repeatedly acknowledged that noncompliance with anticorruption laws, and failure to implement adequate

---

[4]    Ronak D. Desai, *India Remains One of the Most Corrupt Countries in the World*, Forbes (Feb. 11, 2016)  https://www.forbes.com/sites/ronakdesai/2016/02/11/india-remains-one-of-the-most-corrupt-countries-in-the-world/#1a20816e155f.

[5]    http://documents.jdsupra.com/143b9040-f59c-4942-bfdc-9824c8fb9b7c.pdf.

control systems to monitor and enforce compliance, could have serious negative consequences for the Company.  In annual reports filed with the SEC, Cognizant repeatedly stated:

> Among other anti-corruption laws and regulations, we are subject to the United States Foreign Corrupt Practices Act, or FCPA, which prohibits improper payments or offers of improper payments to foreign officials to obtain business or any other benefit, and the U.K. Bribery Act.  Violations of these laws or regulations could subject us to criminal or civil enforcement actions, including fines and suspension or disqualification from government contracting or contracting with private entities in certain highly regulated industries, any of which could have a material adverse effect on our business, results of operations and financial condition.[6]

75.    The Individual Defendants have always maintained that the Company has complied with FCPA regulations.

76.    Cognizant also stated in its SEC filings that it maintained an adequate system of internal accounting controls, as mandated by the FCPA and the Sarbanes-Oxley Act ("SOX"). The FCPA imposes accounting requirements that operate as a complement to, and a means of enforcing, its anti-bribery provisions.  Specifically, the FCPA requires issuers to keep books and records that accurately and fairly describe their transactions, and to develop and maintain an adequate system of internal accounting controls, in order to track payments and prevent bribery. SOX mandates, in part, that internal controls must be designed so as to "ensure that material information relating to the company . . . is made known to" officers responsible for certifying the accuracy of the company s public reports.

77.    A critical element of the internal accounting controls prescribed by the FCPA is called "tone at the top." "Tone at the top" refers to senior management s commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, policies, and, most importantly, management s conduct. SOX also recognizes the

---

[6]    *See, e.g.*, 2014 Form 10-K, at 28; 2015 Form 10-K, at 28; 2016 Form 10-K, at 26.

primacy of "tone at the top" as a control mechanism in, among other things, its rules making a company s senior management ultimately responsible for the quality of an issuer s disclosure controls and financial reporting. Regulators and auditors likewise recognize "tone at the top" as a key internal control mechanism. For example, the Resource Guide to the U.S. Foreign Corrupt Practices Act, jointly issued by the DOJ and the SEC, emphasizes that an issuer s implementation of "an appropriate tone at the top" is a key factor in assessing the seriousness of an FCPA violation.

78.     Thus, Cognizant s maintenance of adequate internal control systems, including its "tone at the top," was of significant importance to investors because it ensured that the Company adhered to the Code of Conduct and Anticorruption Policy it purported to practice, and that the Company s public disclosures were accurate.

79.     On Cognizant s website, the Company also touted the rigorousness of its internal controls, stating "Cognizant employs rigorous internal controls to ensure our commitment to ethical behavior, proper risk management and exemplary corporate conduct. Our internal controls are maintained by an effective and far-reaching corporate governance system implemented by our senior leadership team and overseen by an independent Board of Directors." Based on these statements, the Company assured investors that they could take comfort in the conduct of its management and the accuracy and completeness of its public disclosures.

80.     The cumulative effect of the statements summarized above was to drive Cognizant s stock price significantly higher throughout the Relevant Period.  Specifically, the Individual Defendants  statements caused Cognizant s stock price to rise from $46.50 per share at the start of the Relevant Period to a Relevant Period high of more than $68 per share   an increase of more than 46%.

81.     Unfortunately, as detailed below, the Individual Defendants were covering up the truth of Cognizant s bribery scheme, a systematic wrongdoing that went to the core of Cognizant s operations and involved the highest levels of Cognizant management.

### D.  The Truth Is Finally Revealed

82.     On September 30, 2016, Cognizant announced in a Form 8-K filed with the SEC, that its Board was "conducting an internal investigation into whether certain payments relating to facilities in India were made improperly and in possible violation of the U.S. Foreign Corrupt Practices Act and other applicable laws."

83.     In that same filing, Cognizant also announced that defendant Coburn had resigned amidst the Board s corruption investigation and was being replaced as President by, then-CEO of IT Services, defendant Mehta.

84.     Analysts and investors were shocked by Cognizant s September 30, 2016 disclosures.    In  a  September  30,  2016  report,  Argus  analysts  downgraded  Cognizant, characterizing  the  "announced  resignation  of  the  company s  president  amid  a  corruption investigation in India" as "blockbuster news."[7]  These analysts observed that "[g]iven that a top executive has resigned, . . . we see risks that the illegal practices could be extensive and long-lived.  Additional agencies such as DOJ and SEC could conduct investigations of their own, and this matter could overhang the CTSH shares [for] a significant amount of time."  *Id*. at 1. Similarly, in a September 30, 2016 report, RW Baird analysts expressed deep concern that illegal payments made to procure SEZ permitting could have profoundly adverse consequences for Cognizant, noting that, "[w]hile we haven t seen this in the past, we consider possible outcomes

---

[7]     Jim Kelleher, CFA, *Change in Rating: Downgrading to HOLD on Corruption Probe* 1-2 (Argus Research Co. Sept. 30, 2016).

to include reputational damage could hurt revenue growth via client loss/limited client wins, fines and potential limits on operations in certain areas."[8]

85.    On October 3, 2016, a Morningstar report noted: "Given that Coburn had been with the company for over 20 years and president since 2012, the quick-handed nature of his dismissal seems to indicate a link to the FCPA investigation.[9]

86.    Additionally, Evercore ISI published a report opining that Defendant Coburn s resignation may have been "as a direct result of this investigation":

> This morning Cognizant announced that Gordon Coburn, President, resigned and [has] been replaced with Rajeev Mehta, CEO of [Cognizant] IT Services. In conjunction, [Cognizant] is conducting an internal investigation into whether certain payments relating to licenses and permits on a small number of its 12 owned facilities in India were made improperly and in possible violation of the [FCPA] and other applicable laws. While not specified, we believe Gordon Coburn may have resigned as a direct result of this investigation and potentially other issues [Cognizant] may be facing given a weak discretionary spending environment in the Company s large Financial Services and Healthcare verticals.[10]

87.    On September 30, 2016, in response to the Company s disclosures, Cognizant s stock price swiftly declined. The Company s stock price fell more than 13%, or $7.29 per share, declining from $55.00 to $47.71 on the year s highest trading volume.

88.    On November 7, 2016, Cognizant filed its third quarter results on Form 10-Q with the SEC. In that filing, the Company admitted that Cognizant s "senior management may have participated" in making or had allowed to be made corrupt payments to procure licenses for the Company s Indian facilities:

---

[8]    Jochelle Mendonca, Cognizant Investigating Improper Payments Paid in India; Informs DOJ, SEC, ETtech (Oct. 1, 2016, 09:51 IST), http://tech.economictimes.indiatimes.com/news/corporate/cognizant-investigating-improper-payments-paid-in-india-informs-doj-sec/54607942.

[9] Andrew Lange, Equity Analyst, *Cognizant in Possible Violation of Foreign Corrupt Practices; Scant Detail, Stock Still Undervalued* 1 (Morningstar Equity Research Oct. 3, 2016).

[10] David Togut, CFA et al., *Nibble on Bad News* 1 (Evercore ISI Sept. 30, 2016).

During the closing process for the third quarter of 2016, based on the results of the internal investigation to date, we concluded that as of December 31, 2015 and in subsequent interim periods, *we did not maintain an effective control environment. Specifically, we did not maintain an effective tone at the top as certain members of senior management may have participated in or failed to take action to prevent the making of potentially improper payments by either overriding or failing to enforce the controls established by the Company relating to real estate and procurement principally in connection with permits for certain facilities in India.* . . .

*As a result of the foregoing,* we have determined that a material weakness existed as of December 31, 2015, and continues to exist in subsequent interim periods, in our internal control over financial reporting.

\*      \*      \*

To date, the investigation has identified a total of approximately $5.0 million in payments that may have been improper.  During the three months ended September 30, 2016, we recorded an out-of-period correction related to $3.1 million of such payments that were previously capitalized that should have been expensed.  The remaining $1.9 million of such payments remains under investigation.  The recorded correction resulted in an increase of selling, general and administrative expenses of $3.1 million, a reduction in depreciation and amortization expense of $0.4 million, and a reduction in property and equipment, net of $2.7 million.

(Emphasis added.)

89.     On November 7, 2016, Cognizant held its Q3 2016 earnings conference call with analysts and investors.  During this call, defendant D Souza reiterated that the Company s senior management was involved in the scheme.  He further stated that the members of senior management who participated in the scheme were no longer with the Company:

[W]e discovered in the course of the investigation that certain members of senior management may have been aware of or participated in the matters under investigation.  Any such conduct would be inconsistent with our core values.  Based on the results of the investigation to-date, those who may have been involved are no longer with the company or in the senior management position.

90.     Defendant D Souza s statement leaves little doubt that defendant Coburn, the Company s former President, was personally involved in the bribery scheme. Significantly,

despite his role in actively participating and then concealing the bribery scheme, Coburn was allowed to retire from Cognizant, as opposed to being terminated and bringing claims against him. Essentially, notwithstanding the Company incurring significant damage from the bribery scheme, which occurred as a result of Defendant Coburn s breaches of fiduciary duties as President, the Individual Defendants allowed him to walk away scot free with undeserved compensation.

91.     On February 8, 2017, in connection with its fourth quarter 2016 earnings call, Cognizant provided another update to its ongoing investigation of corrupt payments made to Indian officials.  The Company disclosed that it had discovered another $1 million in improper payments, bringing the total amount of bribes paid to $6 million.

92.     On March 1, 2017, Cognizant filed a Form 10-K with the SEC (the "2016 Form 10-K"), which disclosed that the bribery scheme had been ongoing since at least 2010. Specifically, the 2016 Form 10-K stated:  "To date, the investigation has identified a total of approximately $6 million in payments made between 2010 and 2015 that may have been recorded improperly."

93.     The 2016 Form 10-K also demonstrated that the bribery scheme was widespread and involved multiple members of senior management and other Company employees.  Under "Remediation Plans," the 2016 Form 10-K reiterated that multiple members of senior management were involved with the bribery scheme and acknowledged that additional Cognizant employees may be disciplined:

> [T]he members of senior management who may have participated in or been aware of the making of the identified potentially improper payments and failed to take action to prevent the making of the identified potentially improper payments were no longer with the Company or in a senior management position as of December 31, 2016. Additional personnel actions have been taken with respect to other employees and further actions may be required.

94.     The Company further acknowledged that the damages to the Company due to the bribery scheme were ongoing and severe, stating: "In 2016, we incurred $27 million in costs related to the FCPA investigation and related lawsuits. We expect to continue to incur expenses related to these matters in 2017 and future periods."

95.     On February 27, 2018, Cognizant filed a Form 10-K with the SEC (the "2017 Form 10-K"), which stated: "In 2017, we incurred $36 million in costs related to the FCPA investigation and related lawsuits in addition to the $27 million we incurred in 2016. We expect to continue to incur expenses related to these matters in 2018."

### E. False and Misleading Statements Issued by the Individual Defendants During the Relevant Period

96.     On February 27, 2015, Cognizant filed its 2014 Form 10-K with the SEC, which was signed by defendants D Souza, McLoughlin, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evan, Patsalos-Fox, and MacKay. The 2014 Form 10-K described the "income tax holiday benefits" that Cognizant s "Indian subsidiaries" had received from the "Indian government" as follows:

> Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years. Changes in Indian tax laws that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

97.     The 2014 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> For the years ended December 31, 2014, 2013, and 2012, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately [in thousands] $182,973, $146,326, and $151,789, respectively, and increase diluted EPS by $0.30, $0.24, and $0.25, respectively.

98.     Cognizant also reported that, "[a]s of December 31, 2014, we had outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers."  The 2014 Form 10-K further stated, "We have constructed and expect to continue to locate most of our newer development facilities in SEZs."

99.     The above statements made in the 2014 Form 10-K were materially false and misleading when made.  It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits" that the Company received from the "Indian government" when, in fact, the Company was obtaining those benefits through the bribery scheme detailed herein.  Similarly, it was materially false and misleading for the Individual Defendants to state that the SEZ facilities meaningfully "increase net income . . . and increase diluted EPS" when the Company was obtaining such benefits through the bribery scheme detailed herein.  It also was materially false and misleading for the Individual Defendants to state that the Company had "outstanding fixed capital commitments of approximately $20,452 [in thousands] related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers," when that figure included at least $4.1 million in bribes paid to government officials.

100.    It also was misleading for the Individual Defendants to state that the Company would "locate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme detailed herein.

101.    The 2014 Form 10-K further stated:  "In 2014, our revenue increased to $10,262.7 million compared to $8,843.2 million in 2013."  The 2014 Form 10-K also stated that the "key drivers of our revenue growth in 2014" were:  "[s]olid performance across all of our business

segments"; "[s]ustained strength in the North American market"; "[c]ontinued penetration of the European and Rest of World (primarily the Asia Pacific) markets"; "[i]ncreased customer spending on discretionary projects"; "[e]xpansion of our service offerings, including Consulting, IT IS, and BPS services"; "[i]ncreased penetration at existing customers"; and "[c]ontinued expansion of the market for global delivery of IT services and BPS."

102.    The above statements in Cognizant s 2014 Form 10-K were materially false and misleading when made.  It was misleading for the Individual Defendants to attribute Cognizant s revenue growth to legitimate business factors and conditions, including the "[e]xpansion of our service offerings" and "[c]ontinued expansion of the market for global delivery of IT services and BPS," when, in fact, the Company s financial performance was driven, in material part, by Cognizant s scheme to obtain SEZ licensing by bribing Indian government officials.

103.    On May 4, 2015, Cognizant filed its Q1 2015 Form 10-Q with the SEC that was signed by defendants D Souza and McLoughlin and stated, in part:  "Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."  Cognizant also reported that, in response to the factors and risks affecting its business and operating results, the Company planned to "[l]ocate most of our new development center facilities in tax incentivized areas."

104.    The above statements made in the Q1 2015 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits granted by the government of India for export activities

conducted within Special Economic Zones" the Company had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

105.    It also was misleading for the Individual Defendants to cause Cognizant to state that it would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

106.    In June 2015, Cognizant published and disseminated through its website its 2014 Sustainability Report.[11]  In this report, Cognizant stated that it had performed thorough audits of anticorruption compliance and had discovered "no incidents" of corruption.  Moreover, the Company claimed that it provided "role based anti-corruption training" to Cognizant employees:

**SO 3 Training on Anti-Corruption.**

In 2014, we introduced role based anti-corruption training to supplement the anti-corruption provisions of the general ethics training our employees received.  We delivered 331,114 hours of Code of Ethics training through eLearning in 2014. We also delivered live Code of Ethics trainings to targeted audiences of over 18,000 associates in India and the Philippines.  Our formal learning was supplemented in 2014 by education campaigns featuring games, quizzes and prizes.

Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.

**SO4 Actions taken in response to incidents of corruption.**

No incidents reported in 2014.

107.    The above statements in Cognizant s 2014 Sustainability Report were materially false and misleading when made.  It was misleading for the Individual Defendants to state that "no incidents" of "corruption" had been reported in 2014, when, among other things:  (1) the

---

[11]    https://www.cognizant.com/worldwide_olt/Cognizant-Sustainability-Report-2014.pdf.

Company s President and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company s bribery already had been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant s senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company s internal financial controls designed to detect, report, and prevent such bribes.

108.    It was further misleading for the Individual Defendants to state that extensive "anti-corruption training" had been provided to Cognizant employees, when, no adequate anticorruption compliance training was being provided to Company personnel.

109.    On August 6, 2015, Cognizant filed its Q2 2015 Form 10-Q (the "Q2 2015 Form 10-Q") with the SEC that was signed by defendants D Souza and McLoughlin and that stated, in part:  "Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years."  Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "[l]ocate most of our new development center facilities in tax incentivized areas."

110.    The above statements made in the Q2 2015 Form 10-Q were materially false and misleading when made.  It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" the Company had received, when, in fact, Cognizant was obtaining such benefits through the bribery scheme detailed herein.

111.     It also was misleading for the Individual Defendants to state that the Company would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

112.     On November 5, 2015, Cognizant filed a Form 10-Q (the "Q3 2015 Form 10-Q") with the SEC that was signed by defendants D Souza and McLoughlin and that stated, in part: "Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years." Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "[l]ocate most of our new development center facilities in tax incentivized areas."

113.     The above statements made in the Q3 2015 Form 10-Q were materially false and misleading when made. It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" the Company had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.

114.     It also was misleading for the Individual Defendants to state that the Company would "[l]ocate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

115.     On February 25, 2016, Cognizant filed the 2015 Form 10-K with the SEC that was signed by defendants D Souza, McLoughlin, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, Mackay, and Abdalla. The 2015 Form 10-K touted the "income

tax holiday benefits" that Cognizant s "Indian subsidiaries" had received from the "Indian government":

> Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the Indian government for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years.  [If enacted, proposed changes in Indian tax laws] that would reduce or deny SEZ tax benefits could have a material adverse effect on our business, results of operations and financial condition.

116.   The 2015 Form 10-K quantified the "effect of the income tax holidays granted by the Indian government" as follows:

> For the years ended December 31, 2015, 2014 and 2013, the effect of the income tax holidays granted by the Indian government was to reduce the overall income tax provision and increase net income by approximately $201.4 million, $183.0 million and $146.3 million, respectively, and increase diluted EPS by $0.33, $0.30 and $0.24, respectively.

117.   Cognizant also reported that, "[a]s of December 31, 2015, we had outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers."   The 2015 Form 10-K also stated, "We have constructed and expect to continue to operate most of our newer development facilities in SEZs."

118.   The above statements made in the 2015 Form 10-K were materially false and misleading when made.  It was materially false and misleading for the Individual Defendants to tout the "significant tax incentives" from the "Indian government" and related "benefits realized by us from Indian operations" the Company had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein.  Similarly, it was materially false and misleading for the Individual Defendants to state that the SEZ facilities meaningfully "increase net income . . . and increase diluted EPS" when the Company was obtaining such benefits through the bribery scheme detailed herein.  It also was materially false and misleading

for the Individual Defendants to state that the Company had "outstanding fixed capital commitments of approximately $76.4 million related to our India real estate development program to build new Company-owned state-of-the-art IT development and delivery centers," when that figure included at least $4.1 million in bribes paid to government officials.

119.    It also was misleading for the Individual Defendants to state that the Company would "continue to operate most of our newer development facilities in SEZs," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

120.    On May 6, 2016, the Company filed a Form 10-Q (the "Q1 2016 Form 10-Q") with the SEC that was signed by defendants D Souza and McLoughlin and that stated, in part: "Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years." Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "[l]ocate most of our new development center facilities in tax incentivized areas." Cognizant also reported that, "[a]s of March 31, 2016, we had outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."

121.    The above statements made in the Q1 2016 Form 10-Q were materially false and misleading when made. It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" the Company had received, when, in fact, Cognizant was obtaining those benefits through the bribery scheme detailed herein. It also was materially

false and misleading for the Individual Defendants to state that the Company had "outstanding fixed capital commitments of approximately $76.2 million related to our India development center expansion program to build new state-of- the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

122.    It also was misleading for the Individual Defendants to state that the Company would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

123.    In August 2016, Cognizant published its 2015 Sustainability Report.  This report stated:

> G4-56 The organization s values, principles, standards and norms of behavior such as codes of conduct and codes of ethics.
>
> As a global business, Cognizant is committed to complying with the laws of the countries in which we operate. . . .
>
> *        *        *
>
> Cognizant treats reports of misconduct seriously.  All reports are reviewed by the Chief Compliance Officer, who appoints a responsible person as appropriate to conduct an informal inquiry or a formal investigation.  If a violation of our Standards has occurred, appropriate disciplinary action will be taken against individuals involved as permitted by local laws.  Additional steps will be taken if an alleged violation involves an Executive Officer or Board Member.
>
> Today s dynamic global marketplace demands that we achieve the highest standards of behavior.  It is therefore critical that all of us at Cognizant make business decisions that align with our ethical principles.  This means, in part, that we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business.
>
> *        *        *
>
> SUB-CATEGORY: SOCIETY
>
> Aspect: Anti-corruption

G4-SO3 Total number and percentage of operations assessed for risks related to corruption and the significant risks identified

There were no incidents reported in 2015.

G4-SO4 Communication and training on anti-corruption policies and procedures

We delivered 689,288 hours of Code of Ethics training through eLearning in 2015.  We also delivered live Code of Ethics trainings to targeted audiences of over 203,947 associates in India.  Our formal learning was supplemented in 2015 by education campaigns featuring games, quizzes and prizes.  The percentage of Associates completing the online Code of Ethics training was 94%.  Anti-Corruption training was provided for 500 hours and delivered for selected associates in Administration, Procurement, Sales & Marketing, Finance and other support Functions.

Additionally, our Enterprise Risk Management group conducts annual risk analysis surveys covering all business units and corporate functions to assess the likelihood of various risks including corruption.

G4-SO5 Confirmed incidents of corruption and actions taken

There were no incidents reported in 2015.

124.    It was misleading for the Individual Defendants to state that Cognizant had performed a thorough audit of the Company s anticorruption compliance and that "[t]here were no incidents reported in 2015" of "corruption," or even "significant risks" of "corruption," and that "we comply with all applicable anti-corruption laws, rules, and regulations wherever we conduct business," when, among other things:  (1) the Company s President and other members of senior management were involved in the bribery scheme detailed herein, and thus, were aware of such corruption; (2) the 2015 audit findings providing evidence of the Company s bribery had already been reported to senior Cognizant personnel at the time this report was published; and (3) Cognizant s senior management participated in making the corrupt payments by overriding and/or failing to enforce the Company s internal financial controls designed to detect, report, and prevent such bribes.

125.    Additionally, it was misleading for the Individual Defendants to state that "Cognizant treats reports of misconduct seriously" and that "Cognizant is committed to complying with the laws of the countries in which we operate," because the Company s senior management overrode and/or failed to enforce Cognizant s internal financial controls in order to facilitate the bribery scheme.

126.    It was further misleading for the Individual Defendants to tout the anticorruption training provided to Company personnel, when, as described above, no adequate anticorruption compliance training was provided.

127.    On August 5, 2016, the Company filed a Form 10-Q with the SEC (the "Q2 2016 Form 10-Q") that was signed by defendants D Souza and McLoughlin and that stated, in part: "Our Indian subsidiaries, collectively referred to as Cognizant India, are primarily export-oriented and are eligible for certain income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones, or SEZs, for periods of up to 15 years." Cognizant also reported that in response to the environment of factors affecting its business and operating results, the Company planned to "[l]ocate most of our new development center facilities in tax incentivized areas." Cognizant also report that, "[a]s of June 30, 2016, we had outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers."

128.    The above statements made in the Q2 2016 Form 10-Q were materially false and misleading when made. It was materially false and misleading for the Individual Defendants to tout the "income tax holiday benefits granted by the government of India for export activities conducted within Special Economic Zones" the Company had received, when, in fact, Cognizant

was obtaining those benefits through the bribery scheme detailed herein.  It also was materially false and misleading for the Individual Defendants to state that the Company had "outstanding fixed capital commitments of approximately $184.0 million related to our India development center expansion program to build new state-of-the-art IT development and delivery centers" when that figure included at least $4.1 million in bribes paid to government officials.

129.    It also was misleading for the Individual Defendants to state that the Company would "[l]ocate most of our new development center facilities in tax incentivized areas," when Cognizant was obtaining licenses for its new SEZ facilities through the bribery scheme alleged herein.

130.    At each reporting period during the Class Period, Cognizant overstated its earnings in its publicly filed financial statements by incorrectly booking the bribery payments it made as capital expenditures when, in fact, those payments should have been booked as expenses and charged dollar-for-dollar against the Company s earnings. Specifically, the Company has stated that at least $4.1 million in corrupt payments were incorrectly capitalized, i.e., shown as increased assets on the balance sheet. In truth, as Cognizant has admitted, those payments should have been expensed, i.e., shown as increased expenses on the earnings/profit-and-loss statement. Of this $4.1 million of capitalized expenses, $1 million was expensed as depreciation and amortization. Consequently, Cognizant has admitted that, at each quarter during the Relevant Period the Individual Defendants overstated Cognizant s earnings and investment in physical assets by at least $3.1 million and understated its expenses by the same amount.

**F. The False and Misleading Statements Violate Section 10(b) of the Exchange Act and SEC Rule 10b-5 In Connection With Cognizant's Share Repurchase Program**

131.   In violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, during the Relevant Period Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla caused Cognizant to conduct a stock repurchase program despite their knowledge that, *inter alia,* Cognizant was making improper payments to Indian officials, Cognizant was engaging in a bribery scheme to acquire SEZ licenses, and that the Company was noncompliant with applicable anticorruption laws.

132.   While the Company s shares were trading at artificially-inflated prices through misrepresentations and omissions of Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla concerning the Company s financial and business prospects as alleged herein, these defendants further propped up Cognizant s stock price by causing the Company to repurchase millions of dollars  worth of its own common stock using Company (*i.e.,* shareholders ) funds.

133.   Per the 2015 Form 10-K:

> Our existing stock repurchase program, as amended and approved by our Board of Directors, allows for the repurchase of $2.0 billion of our outstanding shares of Class A common stock, excluding fees and expenses, through December 31, 2017. Under the stock repurchase program, the Company is authorized to repurchase its Class A common stock through open market purchases, including under a trading plan adopted pursuant to Rule 10b5-1 of the Securities Exchange Act of 1934, or private transactions, in accordance with applicable federal securities laws. The timing of repurchases and the exact number of shares to be purchased are determined by the Company's management, in its discretion, or pursuant to a Rule 10b5-1 trading plan, and will depend upon market conditions and other factors.
>
> ***During the three months ended December 31, 2015, we repurchased $42.1 million of our Class A common stock under our stock repurchase program.*** These stock repurchases were funded from working capital and

borrowings under our revolving credit facility. As of December 31, 2015, the remaining available balance under the Board authorization was $437.9 million.

(Emphasis added).

134.    The 2015 Form 10-K further discloses:

| Month | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs |
|---|---|---|---|
| October 1, 2015 - October 31, 2015 | - | - | - |
| November 1, 2015 - November 30, 2015 | 400,000 | 64.82 | 400,000 |
| December 1, 2015 - December 31, 2015 | 250,000 | 64.65 | 250,000 |
| **Total** | **650,000** | **64.76** | **650,000** |

135.    Despite Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla s knowledge of the true facts about the Company s business and financial prospects, these defendants nevertheless authorized and executed the Company s purchases of its own stock at artificially inflated prices. Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla s decisions were not the product of a valid business judgment because the Board knew during the repurchase period that the Company s stock was significantly inflated due to the false and misleading statements set forth in this complaint.

136.    Because the price of the Company s shares was artificially inflated due to the concealment and misrepresentations by certain Defendants, the Company materially overpaid for its own stock. When the truth was revealed, the price of the Company s common stock declined $7.29 per share, or more than 13%, from a close of $55.00 per share on September 29, 2016, to close at $47.71 per share on September 30, 2016    a far cry from the $64.76 average price paid per share in connection with Cognizant s stock repurchase program, as discussed in the table above.

137.    The repurchases falsely signaled to the Company s shareholders and the public that the purchase of Cognizant stock at those prices was the best use of the Company s cash and the purchases of the stock at the market price prevailing at that time represented a good value for the Company. In truth, the Company s expenditures on its own stock were so recklessly improvident as to constitute corporate waste. The repurchases were not designed to serve a legitimate corporate interest. Rather, they were designed to help conceal the true facts concerning the Individual Defendants  misrepresentations and omissions through an inflated stock price.

### G.  The False and Misleading Proxy Statement

138.    In addition to the above false and misleading statements issued and/or caused to be issued by the Director Defendants, the Director Defendants likewise caused the Company to issue numerous false and misleading proxy statements, which sought shareholder approval for, *inter alia*, director re-election and executive compensation policies.

139.    On April 29, 2016, the Director Defendants caused Cognizant to file with the SEC and disseminate to shareholders, a Proxy Statement on Form DEF 14A (the "Proxy Statement") in connection with the Company s annual shareholder meeting.  Among other things, the Proxy

Statement described director responsibilities, the duties of each committee, and provided information about the director nominees up for election. In addition, the Proxy Statement explicitly referenced the Code of Ethics.

140. The Director Defendants drafted, approved, reviewed, and/or signed the Proxy Statement before it was filed with the SEC and disseminated to Cognizant s shareholders. The Director Defendants knew, or were deliberately reckless in not knowing, that the Proxy Statement was likewise materially false and misleading.

141. Among other things, the Proxy Statement sought shareholder approval for: (i) the election of defendants Abdalla, Breakiron-Evans, Chadwick, D Souza, Fox, Klein, Mackay, Narayanan, Patsalos-Fox, Weissman, and Wendel as directors to serve until the Company s 2017 Annual Meeting; and (ii) the approval, on a non-binding, advisory basis, of the compensation of certain executive officers (including defendants D Souza, Coburn, McLoughlin, and Mehta).

142. With respect to the compensation of the Company s executives, the Proxy Statement set forth to Cognizant shareholders that one of the "key elements of our executive compensation program" is "pay for performance."

143. It is under this guise of "pay-for-performance" that the Proxy Statement sets forth the "Primary Compensation Elements for 2015" stating "Our executive compensation program is designed to motivate, retain and engage our executive leadership and appropriately reward them for their contributions to the achievement of our business strategies and goals."

144. The Director Defendants statements in the Proxy Statement, which clearly represented that the Company followed a pay for performance policy, were false and misleading because the Proxy Statement failed to disclose that the Company s financial performance was illusory and misstated. When the Proxy Statement was issued, the Director Defendants knew,

*inter alia*, that Cognizant was making improper payments to Indian officials, Cognizant was engaging in a bribery scheme to acquire SEZ licenses, and that the Company was noncompliant with applicable anticorruption laws, and therefore as a result, the Company s purported financial performance (issued under the Director Defendants  direction and on their watch) that the executive compensation was based upon was materially misstated.

145.    Had the Director Defendants made truthful disclosures in the Proxy Statement, the executive compensation awarded to the Company s named executive officers, which totaled tens of millions of dollars, would have been severely curtailed.  For example, the Proxy Statement discusses how annual cash bonuses to certain of the Individual Defendants were explicitly tied to the Company s financial performance stating:

> The Compensation Committee has designed our annual cash incentive program to stimulate and support a high-performance environment by tying such incentive compensation to the attainment of organizational financial goals and by recognizing superior performance.  The annual cash incentives are intended to compensate individuals for the achievement of these goals.  The Committee determines actual cash incentives after the end of the fiscal year based upon the Company s performance.

> The Compensation Committee believes that each Named Executive s annual cash incentive should be based upon the achievement of financial goals, which are tied to metrics that are valued by our stockholders.  The Compensation Committee believes that our stockholders value and measure the performance of the Named Executives based principally on the growth of Company revenue, earnings and cash flow. Consequently, the Compensation Committee believes it is appropriate to establish three components to the annual cash incentive:  revenue, non-GAAP income from operations ("non-GAAP Income from Operations") (see "Reconciliation of Non-GAAP Financial Measures" on page 55 for a reconciliation of non-GAAP financial measures to our results as reported under GAAP) and days sales outstanding ("DSO").  All three components are subject to adjustment for any acquisitions over the course of the year.  Over the past several years, one of our principal goals has been to grow revenue at an industry-leading pace, while maintaining a targeted level of non-GAAP operating margin and DSO.  The annual cash incentive target has been set in an effort to achieve this operating performance.

*        *        *

The Compensation Committee established revenue and non-GAAP Income from Operations targets at levels 19% and 13% above the Company s 2014 revenue and non-GAAP Income from Operations, respectively.  These targets were established to incentivize the Company s management to prioritize a continued high level of growth in the Company s revenue while maintaining a targeted level of non-GAAP operating margin.

*     *     *

The Compensation Committee set the 2015 target awards for the Named Executives at a level equal to 85% of the Named Executives  base salaries.  Based on the Company s actual 2015 performance against the metrics described above, the Compensation Committee determined that performance under the annual cash incentive program had been achieved at a level equal to 142% of the target award. The target awards and actual awards approved for payment by the Compensation Committee for 2015 to each of the Named Executives are set forth in the following table.

| Name | 2015 Annual Cash Incentive | |
|---|---|---|
| | Target Award | Actual Award |
| Francisco D Souza | $548,250 | $778,306 |
| Gordon Coburn | $521,475 | $740,296 |
| Karen McLoughlin | $345,100 | $489,910 |
| Rajeev Mehta | $457,725 | $649,795 |

146.    Had truthful information been disclosed in the Proxy Statement regarding the Company s actual performance and financial condition, defendants D Souza, Coburn, McLoughlin, and Mehta would not have received such massive cash bonuses.

147.    Finally, if truthful disclosures been made in the Proxy Statement, defendants Abdalla, Breakiron-Evans, Chadwick, D Souza, Fox, Klein, Mackay, Narayanan, Patsalos-Fox, Weissman, and Wendel would not have been re-elected to the Board.

148.    Accordingly, the Proxy Statement, as set forth above, was false and misleading when issued.

**H.    Insider Selling**

149.    During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants took advantage of the artificially inflated prices to sell their Cognizant shares for their own illicit profit.  Specifically, the Insider Selling Defendants *sold more than $48 million* of personally held common stock.

150.    Defendant D Souza was aware of material, non-public information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.  While in possession of this information, defendant D Souza sold 500,000 personally held shares of Cognizant stock at prices from $57.54 to $58.57, while it was trading at artificially inflated prices, obtaining proceeds of more than $29 million on the following dates:

| CTSH | $57.54 | 100,000 | 2016-07-29 |
|---|---|---|---|
| CTSH | $57.83 | 100,000 | 2016-07-28 |
| CTSH | $58.23 | 100,000 | 2016-07-27 |
| CTSH | $58.57 | 100,000 | 2016-07-26 |
| CTSH | $58.14 | 100,000 | 2016-07-25 |

151.    Defendant McLoughlin was aware of material, non-public information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.  While in possession of this information, defendant McLoughlin sold at least 56,000 personally held shares of Cognizant

stock at prices from $60.00 to $67.36, while it traded at artificially inflated prices, obtaining proceeds of approximately $3.51 million on the following dates:

| | | | |
|---|---|---|---|
| **CTSH** | $60.00 | 20,000 | 2016-08-05 |
| **CTSH** | $61.13 | 8,018 | 2016-06-20 |
| **CTSH** | $60.26 | 590 | 2016-06-10 |
| **CTSH** | $61.13 | 1,671 | 2016-06-08 |
| **CTSH** | $61.01 | 880 | 2016-04-07 |
| **CTSH** | $62.67 | 1,641 | 2016-03-30 |
| **CTSH** | $63.75 | 1,393 | 2015-09-09 |
| **CTSH** | $67.36 | 5,171 | 2015-08-05 |
| **CTSH** | $63.75 | 5,000 | 2015-06-12 |
| **CTSH** | $65.00 | 10,000 | 2015-05-04 |
| **CTSH** | $62.78 | 1,863 | 2015-03-18 |

152.    Defendant Coburn was aware of material, nonpublic information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.   While in possession of this information, defendant Coburn sold over 159,000 personally held shares of Cognizant stock while it traded at artificially inflated prices from $60.05 to $65.14, obtaining proceeds of approximately $9.23 million on the following dates:

| | | | |
|---|---|---|---|
| CTSH | $60.72 | 7,881 | 2016-06-07 |
| CTSH | $60.05 | 15,000 | 2016-06-06 |
| CTSH | $61.27 | 12,119 | 2016-05-12 |
| CTSH | $61.56 | 15,000 | 2016-05-11 |
| CTSH | $61.35 | 3,879 | 2015-12-08 |
| CTSH | $62.51 | 15,000 | 2015-12-07 |
| CTSH | $61.77 | 15,000 | 2015-12-04 |
| CTSH | $61.76 | 6,446 | 2015-09-04 |
| CTSH | $64.19 | 14,043 | 2015-06-05 |
| CTSH | $65.14 | 15,000 | 2015-06-04 |
| CTSH | $63.23 | 10,000 | 2015-05-18 |
| CTSH | $64.03 | 15,000 | 2015-05-15 |
| CTSH | $62.19 | 15,000 | 2015-05-14 |

153.    Defendant Klein was aware of material, non-public information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.    While in possession of this information, defendant Klein sold at least 61,229 personally held shares of Cognizant stock while it traded at artificially inflated price of $61.30, obtaining proceeds of approximately $3.75 million on the following date:

| **CTSH** | $61.30 | 61,229 | 2016-05-16 |
|---|---|---|---|

154.    Defendant Breakiron-Evans was aware of material, non-public information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.    While in possession of this information, defendant Breakiron-Evans sold at least 20,000 personally held shares of Company stock while it traded at artificially inflated prices from $57.79 to $62.20, obtaining proceeds of approximately 1.20 million on the following dates:

| **CTSH** | $57.79 | 10,000 | 2016-03-14 |
|---|---|---|---|
| **CTSH** | $62.20 | 10,000 | 2015-03-05 |

155.    Defendant Fox was aware of material, non-public information regarding the Company s financial reporting, including that Cognizant was making improper payments to Indian government officials in exchange for SEZ licensing.   While in possession of this information, defendant Fox sold at least 22,345 personally held shares of Cognizant stock while it traded at artificially inflated prices from $56.69 to $61.50, obtaining proceeds of approximately $1.33 million on the following dates:

| | | | |
|---|---|---|---|
| **CTSH** | $61.50 | 12,345 | 2016-05-10 |
| **CTSH** | $56.69 | 10,000 | 2016-02-22 |

## VI.    THE SECURITIES CLASS ACTION IS SUSTAINED

156.    On August 8, 2018, this Court denied, in part, the motion to dismiss filed in the parallel Securities Class Action.

157.    With regard to the same challenged false and misleading statements as alleged herein, this Court held that plaintiffs in the Securities Class Action adequately set forth allegations to establish the following sets of materially misleading statements: 1) "statements touting the benefits of $EZ licenses;" 2) "statements in the [2014 and 2015] Sustainability Reports touting anticorruption compliance and training and stating that no significant risks of corruption were reported;" and 3) "[Cognizant s] financial reports that misstated bribes as capital expenditures."

158.    Significantly, in denying the motion to dismiss, this Court assigned "a strong inference of scienter as to Cognizant based on the "breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the company, and the alleged involvement of Defendant Coburn and other unnamed members of senior management."

## VII.   DAMAGES TO THE COMPANY

159.   As a result of the Individual Defendants  wrongful conduct, Cognizant disseminated false and misleading statements and omitted material information regarding the bribery of officials in India.  The false and misleading statements have devastated Cognizant s credibility.  Cognizant has been, and will continue to be, severely damaged and injured by the Individual Defendants  misconduct.

160.   As a direct and proximate result of the Individual Defendants  actions, Cognizant has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:  (1) costs incurred from investigating, defending and paying any judgments or settlement in the Securities Class Action, which was recently sustained; (2) costs and expenses incurred from the Company s internal investigation and the investigation into the Company by the DOJ and the SEC;[12] and (3) costs incurred from the misappropriation of Company information by the Insider Selling Defendants for the purpose of selling Cognizant common stock at artificially-inflated prices;(4) costs incurred from compensation and benefits paid to defendant Coburn, which compensation was based at least in part on Cognizant s artificially-inflated stock price; and (5) costs associated with the repurchase of Company shares at prices that were artificially inflated.

## VIII.   PLAINTIFFS' DEMAND AND DERIVATIVE ALLEGATIONS

161.   Plaintiffs bring this action derivatively in the right and for the benefit of Cognizant to redress injuries suffered, and to be suffered, by Cognizant as a direct result of the Individual Defendants  for breaches of fiduciary duties, unjust enrichment, insider selling, violation

---

[12]   Indeed, as noted above, in the 2017 Form 10-K, the Company acknowledged that "In 2017, we incurred $36 million in costs related to the FCPA investigation and related lawsuits in addition to the $27 million we incurred in 2016. We expect to continue to incur expenses related to these matters in 2018."

of Section 14(a) of the Securities Exchange Act of 1934, issuing false and misleading statements in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and corporate waste.

162.     Plaintiffs will adequately and fairly represent the interests of Cognizant in enforcing and prosecuting its rights.

163.     Plaintiffs did not make a pre-suit demand on the Board to pursue this action because such a demand would have been a futile and wasteful act.

164.     At the time this action was commenced, the Board consisted of the following eleven directors: defendants Abdalla, D Souza, Mackay, Weissman, Breakiron-Evans, Fox, Narayanan, Wendel, Chadwick, Klein, and Patsalos-Fox. Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile as set forth below.

**A.     Demand Is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

165.     The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements referenced above, and as such had a fiduciary duty to ensure that the Company s SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

166.     Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company s internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board s duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with

reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that disguised a bribery scheme in which Cognizant paid improper payments to Indian officials in order to obtain the permits for its Indian facilities, which caused the Company s stock to trade at artificially inflated prices and misrepresented the financial health of Cognizant.

167.    The Director Defendants  making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company s internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board s duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties and have resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Cognizant to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

168.    Moreover, all of the Director Defendants are conflicted due to the Securities Class Action s survival of the motion to dismiss under the rigorous standards for pleading securities fraud.  If the Director Defendants were to bring the claims at issue here, it would be tantamount to admitting liability in the Securities Class Action.  If the Company presses forward with its rights of action in this case, then the Company s efforts would undercut or even compromise the defense of the that case, making demand futile.  The Director Defendants are therefore incapable of disinterestedly and independently considering a demand to investigate, commence, or vigorously prosecute this action.

169.    Furthermore, the Director Defendants all negligently made material misstatements in the Proxy Statement and therefore are subject to a substantial likelihood of liability.

170.    Lastly, the Director Defendants also face a substantial likelihood of liability for breaching their fiduciary duties by allowing Defendant Coburn to resign, instead of terminating and bringing claims against him. The Company placed the blame for the bribery scheme on the shoulders of senior management who were "no longer with the Company or in a senior management position," the most prominent of whom was undoubtedly defendant Coburn. Specifically, the Board, in breach of their fiduciary duty, failed to claw back undeserved pay and bonuses Coburn received during the years that his compensation was based in part on inflated growth and success stemming from the bribery scheme that Coburn knew about and participated in. The Director Defendants  decision is not protected by the business judgment rule and constitutes waste. Accordingly, demand upon the Director Defendants is futile.

**B.    Defendants D'Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla Face a Substantial Likelihood of Liability Due to Violating Section 10(b) of the Exchange Act and SEC Rule 10b-5**

171.    In connection with Cognizant s repurchases of Cognizant shares, Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla caused Cognizant to issue and disseminate false or misleading statements, which they knew, or recklessly disregarded, were false or misleading, and were intended to deceive, manipulate, or defraud, as alleged herein. Those false and misleading statements and Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla s course of conduct were designed to artificially inflate the price of the Company s common stock. At the same time that the price of the Company s common stock was inflated due to the false or misleading statements made by Defendants D Souza, Klein, Narayanan, Wendel,

Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla, these defendants also caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to these defendants false or misleading statements, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Therefore Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla are subject to a substantial likelihood of liability.

C.    **Defendants Abdalla, Mackay, Breakiron-Evans, Wendel, Chadwick, and Klein as Audit Committee Members Are Not Disinterested as they Face a Substantial Likelihood of Liability**

172.    During the Relevant Period, defendants Abdalla, Mackay, Breakiron-Evans, Wendel, Chadwick, and Klein served as members of the Audit Committee.  Pursuant to the Company s Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, oversight over the Company s financial information reported to the public and the adequacy of the Company s internal controls.  The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company s SEC filings and other disclosures.  Therefore, the Audit Committee Defendants each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

D.    **Defendants D'Souza, Breakiron-Evans, Fox, and Klein Face a Substantial Likelihood of Liability Because of their Challenged Sales**

173.    Defendants D Souza, Breakiron-Evans, Fox, and Klein each illicitly sold shares of Cognizant stock while they were in possession of material, adverse, non-public information, during a time in which Cognizant stock was artificially inflated due to the Individual Defendants misconduct.  As a result of these illicit insider sales, defendants D Souza, Breakiron-Evans, Fox,

and Klein each received direct financial benefits not shared with Cognizant shareholders, and are, therefore, each directly interested in a demand.  Further, defendants D Souza, Breakiron-Evans, Fox, and Klein each are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  Accordingly, demand upon defendants D Souza, Breakiron-Evans, Fox, and Klein is futile.

### E.   Defendants D'Souza and Narayanan Are Not Independent Per the Company's SEC Filings

174.   Defendants D Souza and Narayanan are not independent directors as the Board admits in the Company s Proxy Statement filed with the SEC on April 29, 2016 ("Proxy Statement").[13]   Defendant D Souza s, as CEO of Cognizant, derives substantially all of his income from his employment with Cognizant therefore he could not independently consider any demand to sue himself for breaching his fiduciary duties to Cognizant because that would expose him to liability and threaten his livelihood.

175.   Defendant Narayanan is Vice Chairman of the Board since 2003, and served as the President from 2003 through 2006 and the CEO of Cognizant from 2003 through 2006.  He also served in certain executive positions at Cognizant s Indian subsidiary, specifically President from 1996 through 2003 and Chief Technology Officer from 1994 through 1996.  Defendant Narayanan cannot independently consider any demand to sue himself for breaching his fiduciary duties to Cognizant because that would expose him to liability and threaten his livelihood, in

---

[13]   Per the Proxy Statement, the Board determined that defendants D Souza and Narayanan are not "independent directors" under the "rules of NASDAQ Stock Market LLC ("NASDAQ"), which require that, in the opinion of the Board, such person not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a Director."

addition to the fact that Narayanan s longstanding business relationship with Cognizant impairs his ability to independently consider a demand.

**F.   Defendants D'Souza and Weissman Are Unable to Independently Consider a Demand**

176.   Demand is futile as to defendants D Souza and Weissman because they have significant business and longtime friendships with defendant Coburn and each other.   In particular, it appears from the Company s announcements that defendant Coburn was one of the "senior management" that perpetuated the bribery scheme.   Defendant Coburn worked extensively with Defendants D Souza and Weissman at The Dun & Bradstreet Corporation ("D&B") in the 1990s prior to and during Cognizant s split from D&B in 1995.   Consequently, defendants D Souza and Weissman s longtime association with one another, and defendant Coburn, prevent them from independently considering a demand.

<u>COUNT I</u>
**(Against the Individual Defendants for Breach of Fiduciary Duties)**

177.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

178.   By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties of care and loyalty owed to the public shareholders of Cognizant.

179.   As demonstrated by the allegations above, the Individual Defendants have failed to exercise the necessary care required, and breached their duty of loyalty because, among other reasons, they caused Cognizant to issue false and misleading statements and they failed to take steps to protect Cognizant from the damage stemming from the Company s ineffective internal controls over financial reporting and Cognizant s bribery scheme.

180.     And, as demonstrated by the allegations above, the Individual Defendants have also failed to exercise the necessary care required, and breached their duty of loyalty because, among other reasons, they failed to take steps to maintain adequate internal controls necessary to prevent against the conduct alleged herein.

181.     As a direct and proximate result of these Individual Defendants breaches of their fiduciary obligations, Cognizant has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II
### (Against Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Concealing Material Information)

182.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

183.     At the time of each of the stock sales set forth above, the Insider Selling Defendants knew, but did not disclose publicly, that the Company lacked effective internal controls over financial reporting and Cognizant had engaged in a bribery scheme that affected the Company s financial condition. The Insider Selling Defendants made each of the stock sales described herein on the basis of and because of their knowledge of the material, non-public information described herein.

184.     Further, at the time of their stock sales, the Insider Selling Defendants knew that when the truth about Company s conduct was finally reported, the price of the Company s common stock would dramatically decrease. The Insider Selling Defendants sale of Cognizant common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

185.     Accordingly, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

186.     Plaintiffs, on behalf of Cognizant, has no adequate remedy at law.

## COUNT III
### (Against the Insider Selling Defendants for Unjust Enrichment)

187.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

188.     By their wrongful acts and omissions, the Insider Selling Defendants, were unjustly enriched at the expense of and to the detriment of Cognizant.

189.     Each Insider Selling Defendant was unjustly enriched by their receipt of proceeds from their illegal sales of Cognizant common stock, as alleged herein.

190.     Plaintiffs, as shareholders and representatives of Cognizant, seeks restitution from the Insider Selling Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Insider Selling Defendants as a result of their wrongful conduct and fiduciary breaches.

191.     Plaintiffs, on behalf of Cognizant, have no adequate remedy at law.

## COUNT IV
### (Against All the Director Defendants for
### Violations of Section 14(a) of the Securities Exchange Act of 1934)

192.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Director Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

193.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the

Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

194.    The Director Defendants negligently issued, caused to be issued, and participated

in the issuance of materially misleading written statements in the Proxy Statement.  Specifically,

the Proxy Statement violated § 14(a) and Rule 14a-9 because it solicited Cognizant shareholder

votes for, *inter alia*, director reelection and executive compensation, while simultaneously

misrepresenting and/or failing to disclose the bribery scheme and the Company s false financial

performance that had been continuously touted and repeated by the Individual Defendants.

195.    As alleged herein, in the Proxy Statement, the Director Defendants also

specifically referenced the Code of Ethics, which required compliance with all laws, rules, and

regulations.  Because the Company, under the Director Defendants  direction and on their watch,

was affirmatively engaging in illicit activity in violation of laws and/or regulations, the Director

Defendants affirmatively violated the Code.  Not only did the Proxy Statement not disclose these

illicit activities, it did not disclose that the express terms of the Code were being violated.  Rather

than disclose the truth of the Company s financial condition and the violations of the Code of

Ethics, the Director Defendants issued a series of false and misleading statements.

196.    Finally, in the Proxy Statement, the Director Defendants repeatedly falsely touted

that the proposed executive compensation packages (which were voted on by the Company s

shareholders) were based on a so-called "pay for performance."   The Director Defendants statements in the Proxy statement, which touted a purported "pay for performance" philosophy were false all along as alleged herein.

197.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy Statement were materially false and misleading.

198.   The misrepresentations and omissions in the Proxy Statement were material.  The Proxy Statement was an essential link in the accomplishment of the continuation of the Director Defendants  scheme.

199.   In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the Proxy Statement were materially false and misleading, and/or that the Proxy Statement omitted material information.

200.    Plaintiffs, on behalf of Cognizant thereby seek relief for damages inflicted upon the Company based on the misleading Proxy Statement in connection with the improper re-election of the members of the Board and the approval of executive compensation.

## <u>COUNT V</u>
**(Against Defendants D'Souza,  Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla for  Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder)**

201.   Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

202.   During the Relevant Period, in connection with Cognizant s repurchases of Cognizant  shares, Defendants D Souza,  Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla disseminated or approved false or misleading statements about Cognizant  as alleged herein, which they knew, or recklessly disregarded, were false or misleading and were intended to deceive, manipulate, or defraud. Those false or

misleading statements and Defendants  course of conduct were designed to artificially-inflate the price of the Company s common stock.

203.    At the same time that the price of the Company s common stock was inflated due to the false or misleading statements made by D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla, these defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to these Defendants  false or misleading statements.

204.    Defendants D Souza,  Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla  violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Cognizant  in connection with the Company s purchases of Cognizant  stock during the Relevant Period.

205.    Throughout  the  Relevant  Period,  Defendants  D Souza,  Klein,  Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla, individually and in concert, directly and indirectly, the Individual Defendants, by the use of means or instrumentalities  of  interstate  commerce,  the  United  States  mails,  interstate  telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the Company and shareholders in connection with their purchases of Cognizant stock during the Relevant Period, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

206.    Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla as senior management and directors of the Company were therefore, directly responsible, and are liable for all materially false or misleading statements made during the Relevant Period, as alleged above.

207.    Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth in this complaint were either known to Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla or were so obvious that these Defendants should have been aware of them. Throughout the Relevant Period, Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

208.    The false or misleading statements of Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla were made in connection with the purchase or sale of the Company s stock, both by the Company itself and by the Insider Selling Defendants.

209.    As a result of the misconduct alleged herein of Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla

Cognizant has, and will continue to, suffer damages in that it paid artificially-inflated prices for Cognizant common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to Cognizant s bribery scheme was disclosed on September 29, 2017. Cognizant would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company s stock price caused by the false or misleading statements of Defendants D Souza,  Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla.

210.   As a direct and proximate result of the wrongful conduct of Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla, the Company suffered damages in connection with its purchases of Cognizant stock during the Relevant Period. By reason of such conduct, Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla. are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT VI
### (Against Defendant Coburn for Unjust Enrichment)

211.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

212.   By his wrongful acts and omissions, Defendant Coburn was unjustly enriched at the expense and to the detriment of Cognizant. Defendant Coburn received bonuses, stock options, stock, or similar compensation from Cognizant that was tied to the Company s financial performance, or otherwise received compensation that was unjust in light of his prominent role in the bribery scheme and his bad faith conduct.

213.   Plaintiffs, on behalf of Cognizant, seeks restitution from Defendant Coburn and seeks an order of this Court disgorging all profits, benefits, and other compensation   including

any salary, options, performance-based compensation, and stock obtained by Defendant Coburn due to his wrongful conduct alleged in this Complaint.

214.   Plaintiffs, on behalf of Cognizant, have no adequate remedy at law.

**COUNT VII**
**(Against the Director Defendants for Corporate Waste)**

215.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

216.   The Director Defendants have a fiduciary duty to protect Cognizant s assets from loss or waste.

217.   The Director Defendants caused Cognizant to waste its corporate assets by allowing defendant Coburn to "retire" as President, even though Cognizant had grounds to terminate Coburn for cause and failed to failed to claw back undeserved pay and bonuses Coburn received during the years that his compensation was based in part on inflated growth and success stemming from the bribery scheme that Coburn knew about and participated in.

218.   In addition, Defendants D Souza, Klein, Narayanan, Wendel, Weissman, Fox, Breakiron-Evans, Patsalos-Fox, MacKay, and Abdalla, by approving the stock repurchase program, these defendant breached this fiduciary duty and have caused Cognizant to waste its corporate assets on the repurchase of stock at artificially-inflated prices.

219.   As a result of the Director Defendants corporate waste, the Company has suffered damages.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment in the Company s favor against the Individual Defendants as follows:

A.      Declaring that Plaintiffs may maintain this derivative action on behalf of Cognizant, and that Plaintiffs are a proper and adequate representative of the Company;

B.      Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants breaches of fiduciary duties and unjust enrichment;

C.      Awarding to Cognizant restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

D.      Imposing a constructive trust and awarding the Company the disgorgement of all profits made by the Insider Selling Defendants as a result of the fiduciary breaches alleged herein;

E.      Granting appropriate equitable relief to remedy the Individual Defendants breaches of fiduciary duties and other violations of law, including, but not limited to, the institution of appropriate corporate governance measures;

F.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys fees, accountants and experts fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## X.      JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 30, 2018                  Respectfully submitted,

Gary S. Graifman, Esq.
Jay I. Brody, Esq.
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**

66

210 Summit Avenue
Montvale, New Jersey 07645
Tel.: 201.391.7000
Fax.: 201.307.1086
ggraifman@kgglaw.com

***Liaison Counsel for Plaintiffs***

William B. Federman, Esq.  (Admitted Pro Hac Vice)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com

***Attorneys for Plaintiffs***

## VERIFICATION

I, John Lautzenheiser, declare that I have reviewed the Amended Complaint ("Amended Complaint") prepared on behalf of Cognizant Technology Solutions Corporation [NASDAQ: CTSH], and I authorize its filing. I have reviewed the allegations made in the Amended Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder and have been a continuous holder of Cognizant Technology Solutions Corporation common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Amended Complaint was occurring.

October 25 , 2018
Date

John Fautzenheiser
JOHN LAUTZENHEISER

## **VERIFICATION**

I, Marjorie A. Hoy, as Trustee and Beneficiary of the James B. Hoy & Marjorie A. Hoy TTEES FBO Marjorie A. Hoy Rev Liv Trust, have authorized the filing of the attached Consolidated Verified Shareholder Derivative Complaint ("Complaint"). I have read the Complaint, and the allegations therein are true to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: October __,2018

*Marjorie A. Hoy*
Marjorie A. Hoy (Oct 27, 2018)

Marjorie A. Hoy

## **COGNIZANT TECHNOLOGY SOLUTIONS CORP. VERIFICATION**

I, Michael S. Graniero III, hereby verify that I am familiar with the allegations in the Consolidated Verified Shareholder Derivative Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: October 25, 2018

Michael S. Graniero III